## State of Vermont v. Karl F. Davignon

[565 A.2d 1301]

No. 87-440

Present: **Peck, Dooley and Morse, JJ., and Katz, Supr. J. and Springer, D.J. (Ret.), Specially Assigned**

Opinion Filed June 16, 1989

Motion for Reargument Denied July 27, 1989

210

*Jane Woodruff*, Orleans County State's Attorney, Newport, and *Jo-Ann Gross*, Law Clerk (On the Brief), Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr.*, Defender General, and *William A. Nelson*, Appellate Defender, Montpelier, for Defendant-Appellant.

**Dooley, J.** Defendant appeals from a judgment of conviction for the crime of aiding in the commission of a felony. Defendant raises four issues on appeal: (1) that the trial court erred in refusing to instruct the jury that defendant could be convicted of aiding in the commission of a felony (a bank robbery) only if he had the intent of permanently depriving the bank of its property; (2) that the trial court erred in failing to inquire whether the defendant's purported waiver of an insanity defense was voluntary, intelligent and knowing; (3) that the court erred in instructing the jury on the beyond a reasonable doubt standard; and (4) that the state's attorney's information failed to charge an offense. We affirm.

Viewing the evidence in the light most favorable to the State and excluding any modifying evidence, *State v. Norton*, 147 Vt. 223, 225, 514 A.2d 1053, 1055 (1986), the facts are as follows.

On October 17, 1986, defendant and one Larry Tabor robbed a bank in North Troy. They drove to the bank in defendant's unregistered 1975 AMC Hornet. During the ride to the bank, defendant handed Tabor his .357 Magnum revolver which defendant had loaded earlier in Tabor's presence. At the instruction of Tabor, defendant backed the getaway car into a parking space outside the bank. The two men waited until approximately 4:45 that afternoon until the bank was clear of customers. Tabor then entered the bank wearing defendant's hat and defendant's red bandanna over his face. Once in the bank, he robbed the tellers at gun point. Two tellers emptied their money drawers into defendant's satchel. One teller inserted a packet of money which contained an exploding dye. An alarm was activated at the bank at 4:53 p.m.

Defendant and Tabor drove off toward Newport, Vermont, following back roads in an attempt to flee. The dye-charged money packet exploded in the car, making it necessary for Tabor to hold the bag of money out the open car door.

Eventually, defendant, in attempting to pass another vehicle, drove the car into a ditch, just after State Trooper Tupper observed the fugitives and began to chase them. Although Trooper Tupper called out "Police, halt," both defendant and Tabor jumped over a fence and ran into the woods. In response to Trooper Tupper's request, a number of law enforcement officials arrived to pursue the suspects. One of the state police officers, Trooper Roberts, followed defendant and Tabor across a field and into an area of thick brush. Trooper Roberts heard the two suspects whispering and saw them walking toward a marsh. When he yelled, "move and you're dead," the two suspects ignored the call and dove into some tall marsh grass. He walked up to where defendant and Tabor sat in the marsh grass and, pointing a 12 gauge shotgun at them, repeated his earlier warning and told the two men to put their hands on their heads.

Tabor immediately placed his hands on his head. Defendant, on the other hand, ripped open his shirt and asked the officer to shoot him in the chest. Defendant resisted arrest from that point on until he was in custody at the Derby Police Barracks. The money was found in the ditch not far from the car. The loaded .357 Magnum was found in the abandoned car. Both defendant and Tabor were found to be drunk.

One of defendant's main contentions is that he lacked the requisite intent to commit the crime. Defendant's argument is that he was involved in the robbery because of his desire to see Tabor be put away for a crime. He claims that he was not helping Tabor, but was actually trying to stop Tabor's career of crime, and that he had to assist with the robbery to help the police apprehend Tabor. However, defendant gave the police no prior warning of his intentions, and he took no action to apprehend Tabor between the robbery and the arrest.

## I.

Defendant's first argument is that the trial court erred in not instructing the jury that defendant could be convicted of aiding in the commission of a felony only if he had the intent of permanently depriving the bank of its property. In order to understand this objection and how it was handled by the trial court, it is necessary first to understand the precise nature of the crime for which the defendant was charged.

Defendant was charged with aiding in the commission of a felony by Larry Tabor in violation of 13 V.S.A. § 3 (one who aids in commission of a felony is punished as a principal). The alleged felony was an assault and robbery in violation of 13 V.S.A. § 608(b). That statute provides:

> (b) A person who, being armed with a dangerous weapon, assaults another and robs, steals or takes from his person or in his presence money or other property which may be the subject of larceny shall be imprisoned not more than 15 years nor less than one year.

In order to convict defendant, the State had to prove that Larry Tabor committed the felony described in § 608(b) and that defendant aided in the commission of the felony.

The trial court broke down the elements of § 608(b) and concluded that the jury could find that Larry Tabor committed the crime by three alternative means represented by the words "robs, steals or takes" in the statute. Thus, the trial court's approach was to lay out three alternative paths for the jury using definitions of rob, steal and take to define the alternatives. This approach led to a disagreement with defendant's counsel over the intent element of the crime. Defendant's counsel argued the crime required that the perpetrator have the specific intent to deprive the bank permanently of the money and that this specific intent must be present whether Tabor robbed, stole or took the money. Specifically, he requested the court to charge the jury that defendant must have had the specific intent to deprive the bank permanently of the money in order to be found guilty of aiding Tabor to commit the crime of assault and robbery.

The trial court agreed with most of the defense argument but took the position that the term "take" established an alternative element that did not require specific criminal intent. Thus, the trial court concluded that an intent to permanently deprive the bank of the money was necessary to find that Tabor robbed or stole the money but not to find that he took the money, and, further, that defendant must have the same intent as that required for Tabor. The trial court position required the refusal of defendant's relatively simple request to charge and the drafting of a relatively complicated and lengthy charge to deal with all the elements, including the

alternative elements. To aid the jury to work through the elements, the trial court constructed a set of interrogatories for the jury to answer.

The jury returned a verdict of guilty and completed the interrogatories. It found that Larry Tabor "robbed" the money from the bank. In the charge, the court defined "to rob" as "to steal ... by the use of force or fear" and "to steal" as "to take ... with the specific intent of keeping it wrongfully or depriving the owner of it permanently."

The jury further found that defendant "aided" in the commission of the felony. The trial court instructed the jury on "aiding" as follows:

> Now, aiding in this context means that where two or more persons combined under a common understanding and with a common purpose to do an illegal act, each is criminally responsible for the acts of the other.... All who knowingly and intentionally participate in the commission of a crime may be convicted of that crime.
>
> In making your determination keep in mind that mere presence at the scene of a crime is not alone sufficient to establish participation or aiding, unless there is something to show the person so present in some way has procured or incited or encouraged the act done by the principal perpetrator.... The use of the term common understanding, common purpose, and common design, are meant to indicate that the State must prove beyond a reasonable doubt that the intent, purpose, and object of the activity in question must be common to both Lawrence Tabor and the defendant....
>
> The defendant has presented evidence that there was no common plan or understanding between himself and Lawrence Tabor because the defendant never intended that the crime be completed successfully; rather that it was his intention to capture Mr. Tabor and bring him to justice. In order to aid another to commit a crime, it is necessary that the accused willfully associate himself in some way with the criminal venture, and he willfully participate in it as he would in something he wishes to bring about. That is to say, that he willfully seek by some act of his to make the criminal venture succeed.

The defendant objected following the charge because it didn't state that the defendant had to act with the specific intent to deprive the bank permanently of the money.

It is now clear that the trial court's view of the intent element for assault and robbery was erroneous and the defendant's view was correct. We recently held in *State v. Francis*, 151 Vt. 296, 561 A.2d 392 (1989), that specific intent should be read into the assault and robbery statute.[1] *Id.* at 307–08, 561 A.2d at 398–99. We specifically pointed out that although 13 V.S.A. § 608 reads "robs, steals, *or* takes ... property" (emphasis supplied), intimating that intent to steal may not be required when one takes property, we would not bifurcate the statute in such a way. *Id.* at 308 n.5, 561 A.2d at 399 n.5. Thus, under *Francis*, intent to deprive the bank of the money permanently is an element of assault and robbery in every case.

The trial court's instruction on accessory liability was, however, correct and specifically stated that defendant could be convicted only if he acted with the same intent as that required for Tabor. In *State v. Orlandi*, 106 Vt. 165, 170 A. 908 (1934), this Court pronounced what was required to find one guilty of aiding in the commission of a crime:

> Where several persons combine under a common understanding and with a common purpose to do an illegal act, every one is criminally responsible for the acts of each and all who participate with him in the execution of the unlawful design.

*Id.* at 171, 170 A. at 910. The trial court adopted much of its charge from *Orlandi*. See also *State v. Miller*, 146 Vt. 164, 175–76, 502 A.2d 832, 839 (1985).

■■ When reviewing a court's charge, we must view it as a whole rather than piecemeal. *State v. Miller*, 146 Vt. at 175, 502 A.2d at 839. It is sufficient if the charge is full, fair and correct on all issues and "breathes the true spirit of the law"

---

[1] *Francis* dealt with assault and robbery under 13 V.S.A. § 608(a). This case involves assault and robbery while armed with a dangerous weapon under § 608(b). For purposes of the intent element, there is no difference in the subsections.

such that there is "no fair ground to say that the jury has been misled." *State v. Gokey*, 136 Vt. 33, 36, 383 A.2d 601, 602 (1978). See also *State v. Roy*, 151 Vt. 17, 24, 557 A.2d 884, 889 (1989); *State v. Day*, 150 Vt. 119, 123-24, 549 A.2d 1061, 1064 (1988). The trial court is free to choose its own language in phrasing the charge.

██  When the jury 'charge in this case is viewed under these standards, it is clear that there was no error. The court made a mistake in detailing the elements of the crime of assault and robbery, but the mistake is harmless because it dealt with an alternative element not part of the jury's determination of guilt. See, e.g., *State v. Valley*, 153 Vt. —, —, 571 A.2d 579, 585 (1989). The mistake made the jury charge longer and more complex than it had to be. The charge was, however, accurate in all material respects, and there is no fair ground to say that the jury has been misled.

## II.

Defendant's second argument is that the trial court had a duty to inquire whether the defendant knowingly, voluntarily and intelligently waived his insanity defense. We disagree.

On October 28, 1986, defendant pled not guilty to aiding in the commission of a felony, 13 V.S.A. § 608(b), and acting as an accessory after the fact, 13 V.S.A. § 5. On November 21st, defendant gave notice of his intent to pursue the affirmative defense of insanity and to offer expert testimony on whether he had the requisite mental state for the offense charged.[2] Such notice is required pursuant to V.R.Cr.P. 12.1(a).[3] On the same date, defendant requested a competency and insanity hearing pursuant to 13 V.S.A. § 4814.

Defendant was found to be competent to stand trial at a hearing held on April 16, 1987. At that hearing Dr. John O. Ives, an associate professor of psychiatry at the University of Vermont and a practicing psychiatrist, testified that de-

---

[2] 13 V.S.A. § 4801(b) states: "The defendant shall have the burden of proof in establishing insanity as an affirmative defense by a preponderance of the evidence."

[3] V.R.Cr.P. 12.1(a) provides in pertinent part: "A defendant who wishes to ... raise the issue of insanity ... must give written notice thereof ... to the prosecuting attorney ...."

fendant suffered from paranoid delusions and was possibly suffering from a mild case of paranoid schizophrenia. He also testified that defendant understood the nature of the charges against him and the possible penalties. Dr. Ives testified that defendant understood the nature and function of a court, its officers, and the attorneys; that defendant understood the role of his attorney; and that defendant was prepared to assist his attorney in providing a defense.

Based on the testimony of Dr. Ives, the court found that defendant suffers from mental illness, which the trial court called a paranoid type personality disorder. The court also found that defendant might suffer from a mild form of paranoid schizophrenia. In spite of the mental illness and possible diagnosis of mild paranoid schizophrenia, the trial court found that defendant was competent to stand trial. The court specifically found that defendant:

> is able to understand the function and role of the jury and of the judge. He is able and willing to cooperate with counsel, and has expressed a desire and ability to cooperate with the public defender's office .... He has indicated a knowledge of the role and function of the prosecution and of the defense attorney. He is presently not under any form of medication, nor is he in need of any medication, or of hospitalization of any kind. He is able to, and has been able to, express knowledge surrounding the events of the alleged incident in which he is involved, both as to the events that occurred prior to and during the time that the incident is alleged to have happened. [He] has been able to do that in an articulate way, so that his defense could be assisted, in terms of gathering the factual information necessary to defend him. He has also been able to express his positions on various matters having to do with his defense, including his position on the issue of competency.... Based on these findings, the Court concludes that Mr. Davignon is competent to stand to trial.

These findings are not challenged in this appeal.

Following the competency hearing, defendant's counsel withdrew and the case was postponed to allow substitute counsel to prepare. Substitute counsel wrote the state's attorney on July 2, 1987, to notify the State that defendant

would not rely upon the defense of insanity. The letter stated "we will not be using the affirmative defense of insanity at trial. We do, however, intend to raise the issue of diminished capacity and will offer expert testimony on this issue." This letter was not made a part of the official record and comes to this Court's attention by way of defendant's brief. No direct evidence exists as to whether defendant knew of this letter or whether defendant agreed with this trial strategy. There was no further discussion on the record about the insanity defense issue.[4]

At trial, defendant offered the testimony of Doctor Gingras, a psychiatrist who had evaluated defendant. Doctor Gingras testified that defendant suffered from paranoid schizophrenia on the date of the crime and that the major symptoms were delusions of grandeur and persecution. He went on to state that as a result of defendant's mental disorder, defendant could not have the specific intent to help Tabor escape arrest because he was "acting on the delusional system."

The prosecution countered with the testimony of Dr. Ives, the psychiatrist who had found defendant competent to stand trial. He testified that defendant was not suffering from a mental disorder and, thus, could form the specific criminal intent necessary for the crime. The question of whether defendant had the requisite criminal intent went to the jury with the charge that if they had a reasonable doubt that defendant "was suffering from some abnormal mental or physical condition ... which prevented him from forming the intent or specific mental state required" he must be acquitted.

Defendant agrees that we have no precedent that requires the court to conduct an on-the-record-colloquy to allow a waiver of the insanity defense. Defendant directs our attention to the District of Columbia and its two decisions in this area: *Whalem v. United States*, 346 F.2d 812 (D.C. Cir. 1965), and *Frendak v. United States*, 408 A.2d 364 (D.C. 1979). In *Whalem*

---

[4] The case was tried before a different judge, and the docket entries and the documents in the record disclose a fair amount of pretrial skirmishing that required hearings before the court. The defendant has failed to provide transcripts of these hearings. It is possible that the insanity defense issue was discussed at these hearings, although we have no indication either way. Normally, we would require defendant to produce these transcripts. We find them unnecessary, however, in view of our disposition of the appeal.

the Court of Appeals held that "a defendant may not keep the issue of insanity out of the case altogether. He may, if he wishes, refuse to raise the issue of insanity, but he may not, in a proper case, prevent the court from injecting it." 346 F.2d at 818. The *Whalem* court adopted the rule that if there is "a combination of factors which required the trial judge to inject the insanity issue ... his failure to do so is an abuse of discretion and constitutes error." *Id.* at 819. The court did not attempt to define what constitutes a "combination of factors." *Id.* at 819 n.10.

In *Frendak* the District of Columbia Court of Appeals rejected part of the holding in *Whalem*, but not all. The *Frendak* court held that "the trial judge may not force an insanity defense on a defendant found competent to stand trial *if* the individual intelligently and voluntarily decides to forego that defense." 408 A.2d at 367 (emphasis in original). *Frendak* constrains the trial court's role in determining how a defendant should plead; it does not eliminate it. See *Frendak*, 408 A.2d at 378 ("Because the defendant must bear the ultimate consequences of any decision, we conclude that if a defendant has acted intelligently and voluntarily, a trial court must defer to his or her decision to waive the insanity defense.").

Defendant's argument is that there is a common requirement in both *Whalem* and *Frendak* that was not met here—namely, that the trial court take some steps on the record to determine whether any purported waiver of the insanity defense was voluntarily and intelligently made by the defendant. Thus, defendant argues that under any view of the law this case must be reversed.

For two major reasons, we do not believe that either the *Whalem* or *Frendak* line of cases apply to this case. The first reason flows from the use of the diminished capacity defense in this case. The underlying requirement of *Whalem* is that any question as to defendant's "mental responsibility" become "part of the case" to "forestall the conviction of one who in the eyes of the law is not mentally responsible for his otherwise criminal acts." 346 F.2d at 818. That requirement was met by the use of the diminished capacity defense.

Our conclusion is apparent from the nature of the diminished capacity defense in this state. In *State v. Smith*, 136 Vt.

520, 527–28, 396 A.2d 126, 130 (1978), we described the diminished capacity doctrine as follows:

> The concept is directed at the evidentiary duty of the State to establish those elements of the crime charged requiring a conscious mental ingredient. There is no question that it may overlap the insanity defense in that insanity itself is concerned with mental conditions so incapacitating as to totally bar criminal responsibility. The distinction is that diminished capacity is legally applicable to disabilities not amounting to insanity .... Evidence offered under this rubric is relevant to prove the existence of a mental defect or obstacle to the presence of a state of mind which is an element of the crime ....

In *State v. Messier*, 145 Vt. 622, 628–29, 497 A.2d 740, 743–44 (1985), we emphasized the overlap between the insanity defense and the mental elements of specific intent crimes. In that case we upheld the validity of 13 V.S.A. § 4801(b) which, by a 1983 amendment, shifted the burden of proof on insanity to the defendant, to be established by a preponderance of the evidence. *Id.* at 627, 497 A.2d at 742–43. We noted, however, that "the evidence offered to prove insanity may also relate to the defendant's state of mind, which remains an essential element to be proved beyond a reasonable doubt by the State. In such a case, [13 V.S.A.] § 4801(b) cannot operate to relieve the State of its burden." *Id.* at 628, 497 A.2d at 743.

Serious collateral consequences may attach to a successful insanity defense. See generally *Offensive Use of the Insanity Defense: Imposing the Insanity Defense Over the Defendant's Objection*, 15 Hastings Const. L.Q. 295 (1988). Especially after the change in the burden of proof on insanity, there are obvious tactical reasons to favor a diminished capacity defense over an insanity defense. Applying the discussion in *Messier*, the trial court in this case charged defendant's theory of diminished capacity as a complete defense. The State was left to show the absence of diminished capacity beyond a reasonable doubt in the face of an expert witness for the defendant who testified that as a result of a mental disease defendant could not form the requisite intent to commit the crime. The

defendant's burden would have been greater if he had pursued the insanity defense.

Given the completeness of Dr. Gingras's testimony, we do not see how the addition of an insanity defense would have helped defendant at all. The issue of defendant's mental capacity was squarely presented to the jury. The defense premised its entire case on defendant's inability to form the requisite specific intent to commit the crime of aiding in the commission of a felony.

The dispute between the psychiatric experts was over whether defendant suffered a mental disease or a defect that had any legally cognizable impact on his conduct on the day in question. The jury necessarily believed that defendant did not suffer from such a mental disease or defect. No additional testimony by Dr. Gingras, to the effect that defendant's mental disease or defect meant that he could not appreciate the criminality of his conduct nor conform his behavior to the requirements of the law, could have had any impact that would have aided defendant's defense.

Thus, the record indicates that defendant's mental capacity was made an issue in this case in order that defendant would not face conviction in the absence of a finding of mental responsibility. The facts did not show any reason for the trial court to go further in pursuing a possible insanity defense. The situation that gave rise to the need for trial court action in *Whalem* and *Frendak* is not present here.

The second major reason is that the District of Columbia cases are being used to create a new "knowing and intelligent waiver" requirement, akin to that imposed if defendant were to plead guilty, although that was not the primary issue in those cases. Other courts have refused to require specific on-the-record-colloquy procedures in cases like this because the defendant has not waived the essential elements of a criminal trial. See *Weber v. Israel*, 730 F.2d 499, 506–09 (7th Cir. 1984); *State v. Smith*, 3 Ohio App. 3d 115, 118, 444 N.E.2d 85, 90–91 (1981). Here, defendant had experienced trial counsel, and there is nothing to suggest that counsel was acting against the wishes of the client. It may be that further facts would establish that trial counsel's representation was inadequate because of a failure to raise and pursue an insanity

defense. See, e.g., cases collected in Annotation, *Adequacy of Defense Counsel's Representation of Criminal Client Regarding Incompetency, Insanity, and Related Issues*, 17 A.L.R.4th 576, § 15 (1982). We cannot, however, consider such an ineffective assistance of counsel claim on direct appeal. See *State v. Gabaree*, 149 Vt. 229, 232–33, 542 A.2d 272, 274 (1988). It must be raised in a post-conviction relief proceeding where factual development is possible. We are unwilling in a case such as this, with no showing of differences between attorney and client or other inadequacy of representation, to require that a trial court second-guess the actions and decisions of experienced trial counsel.

### III.

Defendant next argues that it was error to instruct the jury that proof beyond a reasonable doubt was "proof which is so convincing that reasonable persons would not hesitate to act on it in matters of great personal importance." Defendant did not object to this charge as required pursuant to V.R.Cr.P. 30. Absent plain error, this failure to object constitutes a waiver of the objection. V.R.Cr.P. 52(b); *State v. Parker*, 139 Vt. 179, 183, 423 A.2d 851, 853 (1980). Plain error can be found only in exceptional circumstances where our failure to recognize a claim of error would result in a miscarriage of justice or "where a glaring error occurred during the trial and was so grave and serious that it strikes at the very heart of the respondent's constitutional rights." *State v. Morrill*, 127 Vt. 506, 511, 253 A.2d 142, 145 (1969).

In our recent decision of *State v. Francis*, 151 Vt. at 303–04, 561 A.2d at 396–97 (1989), we held that a similar jury charge did not mandate reversal. See also *State v. Giroux*, 151 Vt. 361, 364–65, 561 A.2d 403, 405–06 (1989). The trial court in *Francis* charged the jury, in part, that reasonable doubt meant "proof which is so convincing that reasonable people like yourselves would not hesitate to act on it in matters of personal importance in your own life." 151 Vt. at 302, 561 A.2d at 395. Although stating "that the better practice for the trial courts is to avoid drawing analogies between the degree of certainty required to convict a criminal defendant and the degree of certainty underlying decisions in matters of personal

importance," we held that the charge did not constitute error. *Id.* at 304, 561 A.2d at 397 (specific language used by the trial court had been approved on many occasions). In the case at bar the trial court charged the jury that proof beyond a reasonable doubt meant "proof which is so convincing that reasonable persons would not hesitate to act on it in matters of great personal importance." In light of *Francis*, the error in this charge, if any, does not constitute plain error.

## IV.

Defendant's final argument is that the information in this case fails to charge an offense because it omits an allegation that defendant acted with culpable intent and incorporates an information against Larry Tabor not made part of the record. In *State v. Roy* we stated that:

> The information must first and foremost inform the defendant of the cause and nature of the accusation against him in order to fulfill the requirements of Chapter I, Article 10 of the Vermont Constitution and the Sixth Amendment to the United States Constitution. The information must set forth the charges with sufficient particularity to allow the defendant to make an intelligent preparation of his defense.

151 Vt. at 28, 557 A.2d at 891 (citations omitted). The information in the case at bar[5] tracked the statutory language of 13 V.S.A. § 3 and made specific reference to the underlying felony, 13 V.S.A. § 608(b), and the actions of defendant and his accomplice in committing the felony. The information reasonably indicated the exact offense charged. See *Francis*, 151 Vt. at 308, 561 A.2d at 399; *State v. Phillips*, 142 Vt. 283, 288, 455 A.2d 325, 328 (1982).

---

[5] The information reads:
> Did then and there aid in the commission of a felony, to wit: a violation of 13 V.S.A. § 608(b) committed by Larry Tabor against Susan Poulin, a copy of which charge is attached hereto and incorporated by reference herein, by driving Larry Tabor to the scene of the crime, backing the vehicle up to the bank, waiting for him to rob Susan Poulin, with the intent of driving the get away car when the robbery was completed all in violation of 13 V.S.A. § 3 and § 608(b).

The charge against Larry Tabor does not appear in the record, and we therefore only look to the four corners of the information.

▮▮▮

▮▮ Defendant failed to object below to any deficiency in the information. He contends that he can raise the issues for the first time on appeal because the information failed to charge an offense since it omitted the intent element implied in the statute. See *Roy*, 151 Vt. at 28–29, 557 A.2d at 891. As in *Roy*, "[w]e find this argument to be hypertechnical and reject it in the circumstances of this case." *Id.* at 28, 557 A.2d at 891. The information complies with V.R.Cr.P. 7(b). "Consistent with the purpose of V.R.Cr.P. 7(b), where the relevant statute does not specify a knowledge or intent element, we believe that the omission of such an implied element is not fatal, especially where defendant has failed to object below." *Id.* at 29, 557 A.2d at 891–92 (citations omitted).

*Affirmed.*